## STATE v. NICHOLS.

No. 6646.  Decided February 11, 1944.  (145 P. 2d 802.)

See 22 C. J. S. Criminal Law, sec. 718; 9 Am. Jur. 272.

*R. R. Hackett,* of Ogden, for appellant.

*Grover A. Giles,* Atty. Gen., and *Herbert F. Smart,* Asst. Atty. Gen., for respondent.

MOFFAT, Justice.

Appellant and one Francis F. Paugh were jointly charged in the District Court of Weber County, Utah, with the felony of burglary in the second degree. Paugh pleaded guilty to the charge. Appellant stood trial and was convicted. He appeals and assigns as errors the trial court's refusal to grant his motion for dismissal made at the time the State rested its case, and the denial of his motion for a new trial.

The motion for a dismissal was made upon the ground that the State had not produced sufficient evidence to justify submitting the case to the jury, and the motion for a new trial was made upon the ground of insufficiency of the evidence to support the verdict of the jury in that the State failed to show that the defendant was connected in any manner with the crime of burglary as charged in the information.

A report was introduced in evidence through a police officer who received it early in the morning of February 22nd, 1943, showing that sometime during the night of February 21 and 22 the premises at 2702 Wall Street in Ogden, Utah, known as Sloppy Joe's, had been entered by breaking the glass out of the north door and that several cartons of cigarettes and a .32 calibre long revolver were missing. The owner of the business was produced and identified the revolver as his gun. The gun had been recovered by police officers from a suit case in a hotel room occupied by appellant Nichols, Paugh and a young woman, under circumstances which will appear later. The owner of the gun, however, stated that he had been in California from the 7th of November, 1942, until he returned to Ogden sometime in March, 1943, and that during his absence his business had been left in the care of his cousin, Jack Olsen. Olsen was not produced as a witness.

The testimony then shows that several Ogden police officers went to a room in the Hyland Hotel about 5 o'clock in the morning of February 23, 1943. They there found appellant Nichols undressed and in bed with a young woman, Ginger Berry, and the co-defendant Paugh fully dressed on the floor near the foot of the bed where he apparently had been sleeping with a blanket or quilt over him. Officer Allred made a search of the room and in a suit case claimed by the young woman to be hers, found the revolver above referred to and identified. The gun was empty. The officers ordered the persons to get dressed and officer Ballantyne testified that, "Dick Nichols [appellant] * * * took the shells out of one of his shoes by the bed and told him [officer

Allred] he might just as well take them too. One of us asked 'Whose gun it was?' and Dick said: 'It was his.' When asked why he didn't have it loaded, he said he didn't carry it loaded. So we brought them over to the police station, the three of them, and locked them up." On cross-examination, officer Ballantyne further testified that he saw officer Allred find the gun "In a suit case on the floor on the west wall * * *. The suit case belonged to the woman, so she said."

"Q. Now you found the shells for the gun in this man's shoes? A. He poured them out of the shoes himself.

"Q. When did he do that? A. That is when he went to put the shoes on.

(Six .32 calibre long cartridges were introduced in evidence. They fit the revolver identified.)

"Q. You stated the defendant here claimed the gun as his gun? A. Yes.

"Q. Just what did he say with reference to that? A. I am not sure whether I asked or the other boys asked him but it seems to me I asked him whose gun it was and he said it was his. I asked what he used it for, and he said he very seldom used it. I asked if he carried it loaded and he said no, he didn't carry it loaded.

"Q. You are sure this man told you that? A. Yes.

"Q. It wasn't Mr. Paugh? A. No it wasn't. It was Dick.

"Q. Did you ask about the shells in his shoes? A. No I don't believe I did.

"Q. Did any of the other officers ask how he happened to put them in his shoes? A. Might have done, if they did I have forgotten.

"Q. You don't remember that part? A. No.

"Q. You don't remember the case clearly? A. Well, I remember we found the gun and he claimed the gun. He offered the bullets out of the shoe, as he went to put it on.

"Q. You remember the elements of the offense and not much else? A. Well, I don't think there is anything else that matters much, is there."

At the conclusion of his cross-examination, Ballantyne testified:

"Q. What else was stolen? A. Cigarettes.

"Q. Did you find the cigarettes? A. No sir, we know where they went.

"Q. Did you find anything to connect this man with these cigarettes? A. Nothing I can say in this court."

On redirect examination, the following took place:

"Q. Alright, how did you find out about the cigarettes? A. Well we had a fellow who claimed—

"Mr. Barker: I object he is going to testify to what someone told him.

"The Court: Objection overruled.

"Q. You may state? A. There was a fellow knew where the cigarettes were, and went in and got the cigarettes and sold them and split the money with Dick and Mr. Paugh.

"Q. The fact is he told you Dick came and got him to dispose of the cigarettes? A. Yes sir.

"Q. And that is the reason you went to the room that morning? A. Yes sir.

"Mr. Barker: I move to strike, someone told him about Dick as clearly hearsay, and the jury be instructed to disregard it.

"The Court: What was the conversation? A. A party came to us and told us where the cigarettes were, and that Dick wanted him to dispose of them, and he got the cigarettes and disposed of them.

"Q. He did get the cigarettes and disposed of them? A. Yes sir.

"Mr. Barker: Did you know that, or is that what he told you?

"The Court: Wait a minute. You objected to this. How do you know he split the money? A. *All I know is what he told us.*

"Q. Where is this fellow? Is he available? A. Well, he is in town, I think. But I don't think he is in the court room.

"Q. Can he gotten here today? A. I don't know. I haven't seen him for some time.

"Q. Have you any way of finding out where he is in town? A. It might take some time. I don't know and I am not sure that he is here, but I think he is; although I am not sure of that.

"The Court: I will sustain the objection and the evidence may be stricken."

The damage was already done by this incompetent testimony, as will be observed from a detailed examination of all the testimony, and as evidenced by the verdict returned by the jury. Even had the trial court explained its incompetency to the jury and instructed them expressly to disregard it, it is doubtful that the injurious effect could have been overcome. If such evidence existed in fact, it should have been properly and competently introduced.

Police officer Allred was then called and testified to finding the three persons in the room, and that

"We searched the room and found I think three suit cases, and going through the suit cases we discovered a .32 caliber revolver * * *. *We asked defendant* [appellant] *a few questions. Not very many.*"

He then identified the revolver and the shells, and as to the latter he was asked:

"Q. And, where did you get those? A. The defendant Mr. Nichols as he went to put on his shoes he took them out of his shoes, and said: 'Perhaps you might want, or need them,' and he handed them to me." "A. I asked him if he knew anything about the burglary, the job at 27th and Wall. He said 'No, he did not. He hadn't heard anything about it.' I asked him where he had been the past few months and he said 'Up in Idaho and Montana,' and that he had arrived in Ogden about two days before."

On cross-examination Allred testified:

"Q. Lieutenant Allred, was anything said to you as to whose gun that was the night of the arrest, or early morning of the arrest? A. *There was nothing mentioned about the gun except, or there was something mentioned about the gun, but I just don't have a recollection what the conversation was relative to the gun.*

"Q. Was anything said as to any gun, whose gun it was? A. I believe he said first it was in the room, I think he said, Mr. Nichols, that it was his gun. Later he said he bought it from somebody.

"Q. You say Mr. Nichols said he had purchased it? A. *I wouldn't be sure, as I recall that is what he said.*

"Q. *Are you sure Mr. Nichols ever claimed the gun? A. I am not sure.*

He then testified that he had known the defendant Nichols for seven or eight years, but that the girl and Paugh were strangers to him.

Appellant Nichols then took the stand in his own defense and testified that he had been convicted of burglary in Ogden in 1936 and that he had been charged with robbery and gambling in Montana; that he had become acquainted with Ginger Berry in Council Bluffs, Iowa, her home town, and they had been friends for some six years; that they had been in Pocatello, Idaho, working and the girl had preceded him to Ogden and had met him at the bus station by appointment the night he arrived in Ogden at about 10:30; that they proceeded to look for a hotel room and met the co-defendant Francis F. Paugh, with whom he had become acquainted in Pocatello; that Paugh told him he was broke and did not have a room; that he, Nichols, rented a room at the Van Ess Hotel with two beds so that Paugh could have a place to sleep that night (the night of Feb. 21st); that he, Nichols, was tired, and, after going down to a coffee shop to get some sandwiches, which took him about twenty minutes, he returned to the room, they ate the sandwiches and he and the girl were in bed and asleep by 12 o'clock; that Paugh had been there but left the room before they were asleep and returned sometime during the night and was in the room when they woke up; they didn't hear Paugh come back. Nichols testified that he did not leave the room that night except to get the sandwiches, and that he slept until about 12 or 1 the next noon; that he and the girl got a room at the Hyland Hotel the next evening and saw Paugh at a beer parlor later. Paugh asked him where he was staying. About 1:30 a.m. he and the young woman went to their room and went to bed and after they had been asleep a short while, Paugh came in. He had been drinking. He sat on the edge of the bed and showed Nichols the gun. "I told him, as soon as he showed me, I told him to get that gun out of that room, and asked him where he got it. He told me he bought it for $3.00 from some fellow." He

stretched out on the foot of the bed and slipped to the floor, "so I threw a blanket down there to cover him up;" that they all went to sleep and the next thing that he remembered the officers were knocking at the door. He got up and let them in. He was undressed, Ginger was undressed and in bed, and Paugh, fully dressed, was on the floor near the foot of the bed. Nichols was then asked:

"Q. Where was the gun? A. I don't know where the gun was at the time, but the officers found the gun in the suit case under clothing right on top.

"Q. Do you know how it got in the suit case? A. No, I don't.

"Q. Did you put it there? A. No, I didn't * * *. They [the officers] told me to get dressed. I started to put my shoes on and my foot went into the cartridges. I didn't know what they was that time, and I picked them up and gave them to Henry Allred.

"Q. Did you put them in your shoes? A. No, I didn't. It seems like a bad place to put shells, doesn't it.

"Q. What was said by you or anyone else as to the ownership of that gun? A. Nobody ever asked who owned the gun. I never told anybody absolutely anybody that I owned, and absolutely no one asked who owned the gun.

"Q. Did you at any time state that was your gun? A. I absolutely did not.

"Did you ever see that gun until that morning? A. Not until that night that Paugh brought the gun in. I never seen it before in my life."

He then denied any knowledge of the burglary and stated that Paugh had not told him about it.

On cross-examination he was asked:

"Q. Where did you have the shoes? A. I had them under the bed, where I had taken them off on the edge of the bed on the floor right near where Paugh was lying. He was lying right near the suit cases, too, because he sat on the foot of the bed and the suit cases were near the foot of the bed, and he just slipped off and was lying on [at] the foot of the bed * * *. I pulled the quilt rolled up at the foot of the bed and put over him * * *. I didn't want him to get cold."

Ginger Berry was then called and substantially corroborated Nichols' testimony. She testified:

"He [Paugh] showed a gun to Dick and Dick asked what he had the gun for, and where he got it. He told him to take the gun out.

"Q. Who told who? A. Dick told Paugh to take the gun out. Dick didn't have his hands on the gun and neither did I. Mr. Paugh told Richard, 'You don't need to be scairt of the gun because he had bought the gun for three dollars * * *. Dick and I hadn't been drinking * * *. Couldn't say he [Paugh] was drunk, but I know he was drinking." Further,

"Q. Who put it [the gun] in the suit case? A. I don't know who put it in. It was lying next to Paugh and Richard's shoes.

"Q. Did you see the bullets come out of the shoes. A. Yes, I did * * *. When Allred told Dick to get his clothes on, Dick was taking his shoe and went to put the shoe on and the bullets were in the shoe and he took them out and handed them to Mr. Allred. * * * Wasn't anything said about the gun I know of. I didn't hear it * * *. I didn't hear Dick say anything about the gun."

In examining and considering the evidence, it must be borne in mind that appellant was charged with burglary—not larceny—and that Paugh, the co-defendant, pleaded guilty to the offense. There is no direct evidence connecting appellant with the crime charged. He was not seen on the streets of Ogden the night the offense is alleged to have been committed, and especially was he not seen at or near the scene of the burglary. His own testimony that he was only out of the room for twenty minutes, long enough to get some sandwiches, is corroborated by Ginger Berry, and no direct evidence is adduced to refute it. There is no direct evidence that appellant had actual or exclusive possession of the gun. The fact that he took the bullets out of his shoe and handed them to the officer can as readily be explained by assuming that Paugh put them there, and put the gun in the suit case near where he lay, as to assume that Nichols was lying. And, under all the testimony, the attempt to introduce hearsay testimony linking appellant with the sale of cigarettes and dividing the proceeds with

Paugh was highly unfair and prejudicial, even though the testimony was ordered stricken. Likewise, there is no competent evidence that appellant aided and abetted or advised and encouraged the commission of the crime charged.

Appellant cites and relies on the cases of *State* v. *Crawford,* 59 Utah 39, 201 P. 1030, and *People* v. *Hart,* 10 Utah 204, 37 P. 330. In the Crawford case [59 Utah 39, 201 P. 1032], this court said:

"We are unable to find in the record a scintilla of evidence tending to connect defendant with the burglary unless it be held that the finding of the articles mentioned in the room occupied by him and another establishes a connection. There was nothing tending to show a conspiracy between him and Austin. There was nothing to show that the articles in question were in his *exclusive possession* or that he ever saw them until they were discovered by the officers. * * * None of the articles were found in a suit case, grip, or other receptacle *exclusively* used by defendant, and, as far as the jewelry is concerned, there is nothing whatever to suggest a reason why the defendant should have even known it was there, much less that he had such possession as will meet the requirements of the law in cases of this kind. * * *

"In these circumstances defendant's counsel vigorously contends that the verdict is not sustained by the evidence. He relies on the following declaration of the rule in 9 C. J. at page 1081:

" 'Possession must not be too remote in point of time and must be *personal and exclusive,* or, if joint with another, *there must be something else in the evidence to connect defendant with the offense.'* (Italics ours.)" (First italics ours.)

And in the Hart case, supra [10 Utah 204, 37 P. 331], this court said and held:

"During Bessler's absence the room was entered, and a pistol was taken therefrom. About six hours after such entry the defendant was arrested on suspicion of having committed some other offense, and was charged with carrying concealed weapons. At the time of his arrest there was found upon his person a pistol, afterwards identified as the pistol previously taken from Bessler's room, and he was thereupon charged with the offense of housebreaking, embraced in the indictment. The defendant pleaded not guilty. Upon the trial he did not go upon the witness stand to explain his possession, and at no time did he make, or refuse to make, any explanation of his

possession of said pistol; and no evidence was in any manner introduced upon the trial, showing or tending to show the guilt of the defendant, or of his connection with said crime charged, except the naked fact that the pistol was found in his possession, as stated. The defendant was convicted, and alleges error * · * * that the verdict is against the law, in that the naked possession of the revolver was the only circumstance tending to show guilt. * * *

"We do not think there was sufficient evidence before the jury to justify a conviction of larceny, had that offense been charged in the indictment; and we are also of the opinion that the naked possession of stolen property from 6 to 24 hours after the larceny or housebreaking, when unaccompanied with any other criminating fact or circumstance tending in some degree to connect the accused with the commission of the offense charged, is not sufficient evidence, of itself, upon which to convict of housebreaking. The offense of housebreaking is ordinarily removed one degree further from the act of larceny, and the mere possession of stolen goods does not have the same tendency to connect the accused with the burglary or housebreaking as it would with larceny. [Citing cases.]

"The fact of recent posession of the stolen property was a pertinent and proper fact to go to the jury, as a circumstance in the case, and if accompanied with such evidence as his denial of possession; his giving false, incredible, or contradictory accounts of the manner of acquiring it; his attempting to conceal it, or being so near to the place where the property was stolen, or the building entered, as to create criminating circumstances against him—such and other like circumstances, when shown in connection with the possession, the larceny, or housebreaking, may raise a strong presumption of guilt in the exclusive possessor. In this case there is a total absence of any other corroborating or criminating circumstance, and we think there was not sufficient evidence before the jury to justify the verdict in this case. The judgment of the court below is set aside, and a new trial granted."

In view of the record, we hold that this appeal is well taken on the grounds urged and that there is not sufficient evidence connecting appellant with the commission of the crime of burglary with which he stood charged to support the verdict of the jury.

The verdict and judgment of the lower court are reversed and the case is remanded for a new trial.

WADE, Justice.

I also concur with what is said by Mr. Justice Mc-DONOUGH.

WOLFE, C. J., concurs in the order reversing the judgment and remanding for a new trial.

LARSON, J., concurs. He also concurs in what is said by Mr. Justice McDONOUGH.

McDONOUGH, Justice (concurring).

I concur in the order reversing the judgment. Certainly under the record before us the mere admission by defendant that the gun in question was his gun would not, with the other evidence adduced, support the conviction. ■ The fact is that the burglary itself was not proved by any competent evidence. The astounding fact is that no one testified to having any information acquired by his own investigation or observation that the alleged crime was perpeterated. All I can find in the record to establish that essential fact I shall briefly set out:

Paugh, co-defendant with Nichols, pleaded guilty to the charge. Clearly his plea would not constitute an admission by appellant that a burglary had been committed. If not, then it must have been established here to the satisfaction of the jury by the testimony of witnesses who themselves knew nothing about it. The proprietor of the place allegedly burglarized was called as a witness. He identified the gun as his. However, upon being asked to describe the appearance of the premises on the day following the alleged entry he stated that he did not know because he had been out of the state from a time about three months prior to such alleged entry until the month following such assumed event. He had left one Olson in charge of the business when he went away. At the time of his departure the gun was on a shelf on the premises.

At the time of the trial, Olson was on a fishing trip. However, the State was permitted, over the objection of defendant, to adduce from a police officer the fact that Olson had told him that a window had been broken on the night of Feb. 21 and that a gun and some cigarettes were stolen. The police officer who received a telephone call from someone reporting a burglary at the premises in question was called to testify. The telephone call was to the effect that a window of such premises had been broken and a gun and some cigarettes stolen therefrom. The witness was permitted to read to the jury his record of such telephone call. He also stated that he went to the place in question and found the window broken. Whether or not it was in that condition the day before, or for the preceding six months, does not appear from his testimony.

The foregoing is all the evidence in the record that a burglary of the place had been committed.

The gravity of having a subpoena served on a devotee of the art of angling on the eve of his departure for a limpid mountain stream; the hazard of planting in the mind of a staunch supporter of law and order the seed of militant anarchy by the act of the sovereign in summoning him from the verdant bank of his favorite fishing hole, to bear testimony to an assault against the peace and dignity of the State; may well be conceded. Nevertheless, even in the face of such a suppositious manifestation of sovereign power curbing the precious liberty of one of its citizens, we are advised by the Constitution and statutes of this State and trial courts have been admonished—as, indeed, have state prosecutors—by prior opinions of this court, that one accused of crime is possessed of certain rights. He has a right to be confronted by the witnesses against him. Art. I, Sec. 12, Const. State of Utah; 105-1-8, U. C. A. 1943. He is presumed innocent until the contrary is proved beyond a reasonable doubt. 105-32-4, U. C. A. 1943.

If we exclude, then, the evidence, admission of which was in violation of the rights of the accused, the following facts remain: At premises located at 2702 Wall Avenue, Ogden,

Utah, euphemistically denominated "Sloppy Joes," a window was found broken. The aperture was of sufficient size to permit ingress or egress by a man. When it was broken, how long it had been in that condition, or who broke it, does not appear. Within the building some three months prior to Feb. 22 there was a gun. Whether it was there just prior to the time the window was broken, the evidence does not advise us. Some time subsequent to Feb. 22 the gun was found in a suitcase in a room occupied by three people, one of whom was the accused. The latter who apparently did not own the suitcase, said the gun was his. From the foregoing the jury found that the accused on the night of February 21, 1943, broke into and entered "Sloppy Joes" with intent to steal. Under the decisions of this court as to the burden of proof in criminal cases, it may be said categorically and without a shadow of a doubt that such finding cannot be sustained.